UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

CAMERON WILLIAMS,

Petitioner,

v.

GREGORY MCQUIGGIN,

Respondent.
______________________________________/

CASE NO. 09-10226
HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

**Answer in Opposition to Petition for Writ of Habeas Corpus**

**Introduction**

Respondent holds Petitioner in custody under the authority of a Judgment of Sentence entered by the Wayne Circuit Court, following Petitioner's jury trial conviction for first-degree felony-murder and armed robbery. The Judgment of Sentence imposes a controlling term of life imprisonment. Petitioner commenced this action under 28 U.S.C. § 2254 by filing a petition with this Court. Respondent understands Petitioner to be raising the following claims:

I. Insufficient evidence to identify Petitioner as an aider and abettor to the murder and robbery.

II. Violation of confrontation rights when the preliminary examination testimony of witness Evans was used without showing that he was not available for trial.

III. Trial counsel was ineffective for failing to challenge witness Evans's arrest and subsequent statement as a product of an illegal arrest.

IV. Appellate counsel was ineffective for failing to raise the above ineffective assistance of trial counsel claim.

Respondent answers the petition and requests that it be denied for the reasons stated below. In addition, Respondent opposes any request for discovery, evidentiary hearings, bond, oral argument, or any other relief. Respondent also opposes any factual assertions made by Petitioner not directly supported by the State record as Petitioner fails to overcome the presumption of factual correctness under 28 U.S.C. § 2254(e)(1) or meet the requirements of 28 U.S.C. § 2254(e)(2).

## Statement of the Case

I. Trial Facts

This case involves the murder of Yousif and Jack Yono during the course of an armed robbery of their family-owned party store. Five persons were charged for these crimes — Laron Harper, Cameron Williams, Trandell Esters, Antonio Evans (a/k/a "Toot"), and Lotoya Williams — only four of whom were in custody at the time the charges were brought. 06/11/02, 172-173, 178-180; 06/13/02, 88-89. Evans, a/k/a "Mango," was not in custody. *Id*. As a consequence, Evans's prosecution was not a part of this proceeding.

Harper, Cameron Williams, and Esters were charged with first-degree felony murder and armed robbery. Harper and Cameron Williams were also originally charged with felony firearm, but these charges were later withdrawn at the conclusion of the preliminary examination. 01/02/02, 4, 130-131. Lotoya Williams, was charged with accessory after the fact to murder, or, alternatively, tampering with evidence. 01/02/02, 4, 141.

Lotoya Williams pled guilty to accessory after the fact the day before juries were selected for Harper and Cameron Williams. 06/05/02, 100, 102-103, 177. She later testified at trial pursuant to a grant of immunity. 06/11/02, 193-209; 06/13/02, 16-50.

Harper and Cameron Williams elected to have jury trials, each had their own jury, and both were found guilty as charged. 06/17/02, 10, 15. Harper and Cameron Williams received identical sentences of life without parole, and 18-to-30 years imprisonment concurrent with the life sentences. Esters waived the jury and was found guilty of armed robbery only.

At trial the evidence showed that Yousif and Jack Yono were well-known to those who lived nearby and frequented their family business, The Three J's Party Store. It was not unusual for the Yonos to extend credit to their customers, who sometimes came into the store just to visit.

Their murder deeply affected this community. 06/06/02, 55-66, 79-89, 97-102, 110-118, 130-137.

62-year-old Yousif Yono died of multiple (4) shotgun blasts, two of which were to the head and neck. 06/11/02, 23-28. Yousif's 28-year-old son Jack also died from multiple gunshot wounds to the face and body, some of which were fired at close range. 06/11/02, 17-22.

Shantel Littlejohn was one of the last customers the Yonos had on December 14, 2001. She lived in the area for some 15 years, and frequented the party store daily due to its close proximity to her home—a one to two minute walk. Littlejohn was pregnant and had a child at home for whom she needed diapers. Littlejohn’s grandmother called the Yonos and got approval for her daughter to buy diapers on credit. 06/10/02, 7-8, 11, 21, 29.

Littlejohn knew Harper from the neighborhood, and knew of Cameron Williams and Esters, although not by name. 06/10/02, 8-11.

Littlejohn walked to the party store to buy diapers for her child even though it was raining. Sometime after she entered, Harper entered the store and Littlejohn greeted him. Harper spoke to Jack Yono and got on the telephone. While Harper was using the telephone, Cameron Williams entered, but Littlejohn did not speak to him. Harper was in the store with Littlejohn for about five minutes before she left. 06/10/02/ 11-16, 24-27.

Upon her exit, Littlejohn noticed a red Neon parked along side the store with its hood up as if the owner was having car trouble. There was a man looking under the hood with the oil stick in hand. Littlejohn recalled that Harper and Cameron Williams followed her out of the party store. Upon their exit, they stood next to the party store, and may have walked towards the Neon car. Littlejohn did not hear any gunshots during her walk home. 06/10/02, 15-17, 23, 33-35.

Littlejohn learned of the Yono murders about twenty minutes after leaving their store. But before doing so, Littlejohn ran a quick errand and was back within ten minutes. Upon her return, Littlejohn saw the police and medical personnel at the store. Neither the Neon, nor Harper or Cameron Williams, were at the party store when Littlejohn made this observation on her return home. 06/10/02, 21-24, 31-32.

Littlejohn gave the police a statement after the murders. While she gave the police a description of Harper and Cameron Williams, she did not give them Harper's name because she was pregnant and feared for her safety. This is also the reason why she did not identify Harper at his preliminary examination. 06/10/02; 17-21.

14-year-old Evan Howard had known Harper for about a year from the "hood." Howard had seen Cameron Williams from the neighborhood, and knew Esters as well. Howard lived two doors away from the party store on the day the Yonos were murdered. He heard two of the gunshots and looked out of his window in time to see two men getting into a red Neon. Howard could not identify any of the defendants in court as persons whom he saw getting into the vehicle, but the police had put down in his written statement that one of those persons was Harper. Howard told the police the truth when giving his statement, but he did not name Harper as one of the men he saw getting into the red Neon. Howard was reluctant to testify in court because he still lived in the neighborhood and was afraid. 06/10/02, 72-93.

Harper was known to have driven around the neighborhood in a red Neon. 06/06/02, 117. As near in time as the day before the murders, Harper and "Mango" were seen together in the Neon. The ignition had been pulled out of the car at that time. 06/06/02, 135-137.

Monyaka Burnett was Harper's girlfriend. Burnett knew Cameron Williams, Esters, and "Mango" from the neighborhood. Burnett spent about three nights with Harper over at his home on Lakewood. "Mango" lived there along with his cousin Dion. 06/10/02, 98-102.

21-year-old Thomas Jackson was friends with Harper and "Cammy," and knew of "Mango" and Esters. Jackson also knew of a person named "D," but did not know his real name. "D" had a baby by Jackson's niece, and drove a white Cadillac. Like Jackson, Harper lived on the east side, and, at times, stayed at a white house on Lakewood. 06/06/02, 181-186; 06/10/02, 45-47.

At about 8:30 a.m. on the morning of the murders, Harper told Jackson that he was going to "hit a lick," or commit a robbery, during which he thought would net somewhere in the area of between $6,000.00 to $7,000.00. Jackson later dropped Harper off at his home on Lakewood. Cameron Williams was on the porch when Harper was dropped off. The red Neon was at the Lakewood address at this time, and Jackson noted that it was operational. 06/06/02, 194-199.

Jackson spoke with Harper the day after the murders. Harper said that the police were looking for him for some "bullshit." Harper didn't want to talk about it over the phone, but said he would talk to Jackson in person. 06/06/02, 196-198.

The red Neon, which was indeed reported stolen, was found near the party store engulfed in flames two days after the Yonos were murdered. 06/06/02, 147-149.

Larry Evans was the cousin of "Mango," and grew up with Harper, who he referred to as "Low," and Cameron Williams. These three paid Evans a visit the afternoon of the Yono murders. Evans was cleaning up his apartment when his cousin came in and asked for Evans's keys. "Low" and Cameron Williams were outside while this occurred. Evans did not know how the three arrived at his apartment, but "Mango" asked his cousin if he would "put up" two guns

for him—one was a twelve gauge and the other was a semi-automatic. Evans told his cousin that he was busy cleaning, but that he, "Mango," could find a place for the guns. 06/13/02, 52-64.

Later, all three were in Evans's apartment. Evans, "Mango," and "Low" went for a walk. Evans wanted to purchase something from a gas station, while "Mango" and "Low" wanted to call for a ride. After running their errands, the three returned to Evans's apartment and played a card game to pass the time to await their ride. "Mango" asked his cousin to turn on news. Evans did so and they listened to a news story about an armed robbery and murder at a party store. None of the three commented on the story. The three eventually left, but Evans did not see the type of vehicle in which they left because he was cleaning. *Id.*

A day or two later, Cameron Williams removed the guns from Evans's apartment. Evans asked Cameron Williams to borrow $10.00 at this time, but Cameron Williams said he didn't have any more money left after the robbery. Homicide officers came to Evans's apartment on Sunday or Monday night, but the guns had been removed already. This is the first time that Evans knew the guns were involved in the murders. Evans showed the officers where it was that the guns were hidden. The officers found a clip that Evans identified as having come from one of the weapons that were hidden in his apartment. *Id.*.

Latoya Williams pled guilty to accessory after the fact and was subsequently granted immunity for her testimony. She met a man named Ray in a bar in early December, 2001. Ray drove a white Cadillac and lived at a house on Lakewood. Lotoya dated Ray a few times and spent the night with him at his Lakewood home. Lotoya met Cameron Williams there, had seen Harper there, but had never seen Esters. Latoya had heard Ray use the name "Mango" though. 06/11/02, 199-204.

On December 14, 2001, Mercer called her to arrange a meeting. The two met sometime around 4:00 p.m. and went to The Three J's Party Store where there were a lot of police. Latoya had never been on that street. They did not stop or get out. Lotoya told Ray to take her back to her car, which he did. Ray called her later that evening and she spent the night with him at the Lakewood address. 06/13/02, 25-26

Latoya went home the following morning, Saturday, December 15, 2001. Later on that afternoon, Ray wanted her to see him again at the Lakewood address so she made her way over there. Cameron Williams was at the Lakewood address at this time. The three left in Ray's white Cadillac and went to a house with which Latoya was unfamiliar. Ray and Cameron Williams got out of the car and went inside, staying about 20 to 30 minutes. When they left, one of the two was carrying a box which was placed into the trunk of Ray's car. The three drove to a second location. Both Cameron Williams and Ray got out. Cameron Williams took the box out of the trunk and knocked on the side door while Ray knocked on the front. No one answered so the two returned to the car. The three then went to Latoya's home. Ray said that he was holding some guns for someone and that he did not think they were safe at that location. He wanted to place them in Latoya's basement and would get them the day after. Latoya agreed. The three then went back to the home on Lakewood where Cameron Williams called a lady friend of his and the four drove around downtown. After they drove around, they returned to the Lakewood address either late Saturday or early Sunday morning, where the police were waiting for them. Cameron Williams fled, but was captured and arrested. The other three were arrested as well. Latoya was questioned and released at dawn. The police contacted her and she returned to the station to pick up Ray. Latoya took Ray to his home on Lakewood and it looked like it had been ransacked. 06/13/02, 27-40, 16-18.

At about 3:00 a.m. on Monday morning, Ray and Latoya were together when the police called to say they wanted to talk with Latoya again, this time about the weapons. Latoya got suspicious about the box, and told Ray to get it out of her house. Ray put the box in his car, Latoya got in her car, and the two went over to a friend of Latoya's, Kim Nash. Lotoya had called Nash first. Nash let Latoya put the box in a closet. 06/13/02, 40-43.

Kim Nash had known Latoya Williams since grade school. Sometime around 3:00 a.m. on December 17, 2001, Latoya called and asked to store something at Nash's house. Nash agreed. Her friend stopped by in her blue Sable or Taurus, and brought a Christmas box with her, placing it in the storage area at Nash's home. 06/10/02, 157-167.

A person driving a white Cadillac accompanied Latoya. Nash knew the person driving the Cadillac through Latoya, and he was known to Nash as "Little." *Id.*

Nash got into "Little's" vehicle and the two went over to Latoya's grandmother's house where she was arrested. After Latoya's arrest, Nash went back home. She peeked inside of the Christmas box and saw the shadow of a gun. Nash closed the box quickly. Approximately 15 minutes after she arrived home officers from the Detroit Police Department were at her door, inquiring about her friend Latoya and a box. Nash led the officers right to the box which held the guns. *Id.*

Special Operations Officer Marvin Ouellette confiscated a sawed-off shotgun from a Christmas tree box at the home of Kim Nash. Right next to it was a Thompson sub-machine gun. 06/10/02, 148-153.

Special Operations Officer Murch Snyder had 2983 Lakewood under surveillance on December 16, 2001, at about 12:15 a.m. when a white Cadillac, occupied by Raymond Mercer, Cameron Williams, Latoya Williams, and Latonya Rucker pulled up at the residence. Synder

pulled up behind the Cadillac and activated his emergency lights. As Murch and his partners exited his vehicle, Cameron Williams looked in their direction and fled. Murch and one of his partners pursued Cameron Williams and apprehended him after a short foot chase. Mercer, Rucker, and Latoya Williams were all taken into custody at this time. 06/10/02, 54-60.

Police Officer Barbara Simon testified to taking Harper's statement and it was read into the record before his jury. 06/11/02, 85-91. Police Officers Barbara Simon, Andrew Sims, and Kurtis Staples each testified to taking a statement from Cameron Williams, and those statements were admitted before his jury. 06/11/02, 137, 143-144, 150-154.

## II. Procedural History

Petitioner raised what now form his first two habeas claims in the Michigan Court of Appeals during his appeal of right. The Court of Appeals affirmed in an unpublished opinion.[1] Petitioner then raised the same claims in the Michigan Supreme Court, but his application for leave to appeal was denied by standard order.[2]

Petitioner returned to the trial court and filed a motion for relief from judgment. After it was denied by the trial court, he filed an application for leave to appeal in the Michigan Court of Appeals. The application raised, among other claims, the two claims that now form his third and fourth habeas claim. The application was denied for lack of merit in the grounds presented.[3] Petitioner applied for leave to appeal this decision in the Michigan Supreme Court but it denied relief under M.C.R. 6.508(D).[4]

---

[1] *People v. Williams*, Mich. Ct. App. No. 246111.
[2] *People v. Williams*, Mich. Sup. Ct. No. 128041 (August 30, 2005).
[3] *People v. Williams*, Mich. Ct. App. No. 279658.
[4] *People v. Williams*, Mich. Sup. Ct. No. 136248 (October 27, 2008).

**Statement Regarding Applicable Bars to Review**

In conformance with Rule 5, Respondent states as follows with respect to whether any of Petitioner's claims are barred from habeas review.[5]

I. Exhaustion of State Court Remedies

A habeas petitioner is required to fairly present all of his habeas claims to the State courts before presenting them in federal court in a habeas action. 28 U.S.C. § 2254(b)(1). Petitioner exhausted his first two claims during his direct appeal, and he exhausted his third and fourth claims during his state post-conviction review.

II. Procedural default

With respect to Habeas Claims three and four, they were presented to the State courts during his motion for relief from judgment and subsequent appeal. Review of these claims is barred because Petitioner was required by State law to present them in his direct appeal. Both state appellate courts denied Petitioner relief with respect to these claims by using the common form order stating that the appeal was denied "for failure of the defendant to meet the burden of establishing entitlement to relief under M.C.R. 6.508(D)."

---

[5] Rule 5 of the Rules Governing Section 2254 Cases in the United States District Court states as follows:

Rule 5. The Answer and the Reply

(b) Contents: addressing the allegations; stating a bar. The answer must address the allegations in the petition. In addition, it must state whether any claim in the petition is barred by a failure to exhaust state remedies, a procedural bar, non-retroactivity, or a statute of limitations.

It is well-established in this circuit that the procedural bar set forth in Rule 6.508(D) constitutes an adequate and independent ground on which the Michigan Supreme Court may rely in foreclosing review of federal claims.[6]

In *Burroughs v. Makowski,*[7] the Court considered the form order used by the state appellate courts here and found that it presented a sufficient explanation that the ruling was based on the failure to comply with a state procedural rule.[8]

Where a state court denies relief on independent and adequate state procedural grounds, as the state courts did here, a prisoner may only obtain habeas review of such claims if he can establish "cause and prejudice" or that the failure to review the claims would result in a "fundamental miscarriage of justice."[9]

In order to establish "cause," to excuse his default, a habeas petitioner must establish that some objective factor external to his defense prevented him from complying with the state procedural rule.[10]

Here, Petitioner asserts in his fourth claims that the ineffectiveness of his appellate counsel constitutes cause to excuse his failure to raise his ineffective assistance of trial counsel claim during his appeal of right. First, in order for attorney error to constitute cause, it must rise to the level of ineffective assistance of counsel under the standard of *Strickland v. Washington,*[11]

Petitioner's appellate counsel raised several issues in his appeal of right in the Michigan Court of Appeals. The state appellate court issued a lengthy opinion ruling on these issues. A

---

[6] *Howard v. Bouchard*, 405 F.3d 459, 477 (6th Cir. 2005).
[7] *Burroughs v. Makowski*, 282 F.3d 410, 413-414 (6th Cir. 2002).
[8] See also: *McFarland v. Yukins*, 356 F.3d 688, 697-698 (6th Cir. 2004); *Simpson v. Jones*, 238 F.3d 399, 407-408 (6th Cir. 2000); *Gonzales v. Elo*, 233 F.3d 348 (6th Cir. 2000); *Luberda v. Trippett*, 211 F.3d 1004 (6th Cir. 2000).
[9] *Strickler v. Greene*, 527 U.S. 263 (1999).
[10] *Murray v. Carrier*, 477 U.S. 478 (1986).
[11] *Strickland v. Washington*, 466 U.S. 668 (1984). *Byrd v. Collins*, 209 F.3d 486 (6th Cir. 2000).

fair reading of the opinion shows that at least some of these issues, though meritless, were substantial. While Petitioner's appellate counsel did not raise every conceivable claim, the Supreme Court had held that failure to raise every colorable argument does not constitute ineffective assistance of counsel: "A brief that raises every colorable issue runs the risk of burying good arguments – those that, in the words of the great advocate John W. Davis, 'go for the jugular' – in a verbal mound made up of strong and weak contentions."[12] Appellate counsel's actions here of excluding the claims raised in the motion for relief from judgment in favor of others was a strategic decision and does not constitute ineffective assistance of counsel.

Petitioner is required to show that his appellate attorney was so thoroughly ineffective that defeat was "snatched from the jaws of victory."[13] Petitioner has simply failed to show that his appellate attorney's inadequacy deprived him of victory. The underlying ineffective assistance of trial counsel claim was extremely weak. Petitioner alleges that his trial counsel should have moved to exclude Evans's statements on the additional ground that it was the product of an illegal arrest of Evans. Such an objection would have obviously been overruled because Petitioner has no standing to challenge the legality of Evans's arrest. *Rakas v. Illinois*, 439 U.S. 128 (1978) (passengers in automobile they did not own could not challenge search because their own Fourth Amendment rights were not violated); *United States v. Padilla*, 508 U.S. 77 (1993) (per curiam) (rule regarding standing to challenge constitutionality of search is not subject to "coconspirator exception").

---

[12] *Jones v. Barnes*, 463 U.S. 745, 753 (1983).
[13] *United States v. Morrow*, 977 F.2d 222, 229, (6th Cir. 1992) (*en banc) cert. Den.*, 508 U.S. 975 (1993); *West v. Seabold*, 73 F. 3d 81, 94 (6th Cir. 1996).

As Petitioner has completely failed to establish good cause to excuse his default, there is no need to address the prejudice.[14]

The narrow exception for fundamental miscarriages of justice is reserved for the extraordinary case in which the alleged constitutional error probably resulted in the conviction of one who is actually innocent of the underlying offense.[15] A claim of actual innocence "requires [the] petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial."[16] Petitioner has not presented any new evidence in support of a claim of actual innocence. Therefore, a miscarriage of justice will not occur as a result of the Court's failure to consider the substantive merits of Petitioner's claim about the lack of a curative jury instruction. His claim is procedurally defaulted.

III. Non-retroactivity doctrine

Petitioner may not rely on rules of law that were recognized after his conviction became final. Even in the absence of §2254(d)'s deference standard, the Supreme Court has made clear that federal courts may not grant state prisoners relief in collateral proceedings if to do so would create new rules of constitutional law which were not controlling at the time of the state court decision. This is so because the purpose of federal collateral review is to uphold final state court judgments which were valid when entered, not as a "mechanism for the continuing reexamination of final judgments."[17] Thus, the federal courts are required to "validate

[14] *Smith v. Murray*, 477 U.S. 527, 533 (1986); *Long v. McKeen*, 722 F.2d 286, 289 (6th Cir. 1983).
[15] *Dretke v. Haley*, 541 U.S. 386, 388 (2004); *Carrier*, 477 U.S. at 496.
[16] *Schlup v. Delo*, 513 U.S. 298, 324 (1995).
[17] *Sawyer v. Smith*, 497 U.S. 227, 234 (1990).

reasonable, good-faith interpretations of existing precedents made by state courts."[18] The Supreme Court, moreover, has made clear that the "new rule" doctrine survives the 1996 amendments to § 2254.[19] To the extent Petitioner attempts to support any of his claims with new rules established after his conviction became final, he is prevented from doing so under this doctrine.

IV. Statute of Limitations

28 U.S.C. §2244(d) provides for a one-year statute of limitations after finalization of direct review with a properly filed collateral review tolling the limitations period. The instant petition was timely filed.

---

[18] *Saffle v. Parks*, 494 U.S. 484, 488 (1990).

[19] *Schriro v. Summerlin*, 542 U.S. 348 (2004) (holding that *Ring v. Arizona*, 536 U.S. 584 (2002), was new rule); *Banks v. Horn*, 536 U.S. 266, 272 (2002) ("in addition to performing any analysis required by AEDPA, a federal court considering a habeas petition must conduct a threshold [new rule] analysis when the issue is properly raised by the state"); *Breard v. Greene*, 523 U.S. 371, 377 (1998) (per curiam) (argument that "Vienna Convention" claim too novel to be barred by § 2254(e)(2) is barred by new rule doctrine).

**Evidentiary Hearings and Discovery**

Petitioner has not demonstrated entitlement to an evidentiary hearing because the petition may be denied based on the existing record. Under § 2254(e)(2), a petitioner is not permitted to develop new facts in federal court unless the prisoner was (1) diligent in developing his claim in state court or (2) was not diligent but his claim either relies on a new rule of constitutional law made retroactive by the Supreme Court of the United States, or the new facts could not have been discovered previously by the exercise of due diligence and are sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable fact-finder would have found the petitioner guilty of the underlying offense.[20]

In *Schriro v. Landrigan*, the Supreme Court held that "[b]ecause the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate."[21] The Court held that "[i]t follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."[22] And further that "[t]his principle accords with AEDPA's acknowledged purpose of 'reducing delays in the execution of state and federal criminal sentences.'"[23] The Court observed that, without this limiting standard, "[i]f district courts were required to allow federal habeas applicants to develop even the most insubstantial factual allegations in evidentiary hearings, district courts would be forced to reopen factual disputes that were conclusively resolved in the state courts."[24]

[20] *Williams v. Taylor*, 529 U.S. 420, 435-436 (2000).
[21] *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).
[22] *Landrigan*, 550 U.S. at 474.
[23] *Landrigan*, 550 U.S. at 475, quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (citing *Williams v. Taylor*, 529 U.S. 362, 386 (2000), opinion of Stevens, J.).
[24] *Landrigan,* 550 U.S. 465, 475 (2007).

Respondent also contends that Petitioner has not demonstrated entitlement to discovery. For good cause shown, the district court has the discretion to permit discovery in a habeas proceeding,[25] "provided that the habeas petitioner presents specific allegations showing reason to believe that the facts, if fully developed, may lead the district court to believe that federal habeas relief is appropriate."[26] "Conclusory allegations are not enough to warrant discovery under Rule 6, rather, a petitioner must set forth specific allegations of fact."[27] Petitioner has not met this burden.

---

[25] Rule 6(a) of the Rules Governing Section 2254 Cases in the United States District Court.
[26] *Lott v. Coyle*, 261 F.3d 594, 602 (6th Cir. 2001).
[27] *Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004). (brackets and internal quotation marks omitted); see also id. ("Rule 6 does not sanction fishing expeditions based on a petitioner's conclusory allegations") (internal quotation marks and citation omitted))

**Standard of Review**

Congress mandated the standards of review in federal habeas proceedings in 1996 in the Antiterrorism and Effective Death Penalty Act, the AEDPA. Under 28 U.S.C. § 2254(e)(1), a determination of a factual issue made by the state courts shall be presumed correct and may be rebutted only by clear and convincing evidence.[28] Facts found by a State appellate court enjoy the same presumption.[29]

For claims decided on the merits by the State court, relief may not be granted to Petitioner under § 2254(d) unless the state court's decision was contrary to, or involved an unreasonable application of, clearly established law as determined by the Supreme Court of the United States, or unless the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."[30] Under this controlling standard, a federal court is not free to second-guess the judgment of the State court regarding the merits of any constitutional claim, unless "the state court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the United States Supreme] Court has on a set of materially indistinguishable facts."[31]

In *Bell v. Cone*,[32] the Supreme Court made clear that the federal courts may not conduct a de novo review of claims rejected on their merits by the state court: "a federal habeas court may

---

[28] *Landrigan*, 550 U.S. at 473-474.
[29] See *Sumner v. Mata*, 449 U.S. 539, 541-549 (1981).
[30] *Landrigan*, 550 U.S. at 473.
[31] *Williams v. Taylor*, 529 U.S. 362, 413 (2000).
[32] *Bell v. Cone*, 535 U.S. 685 (2002).

not issue a writ … 'simply because a federal habeas court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.'"[33]

Indeed, even when the state court decision in fact is incorrect, it is not grounds for relief in a federal habeas court unless it also was unreasonable.[34] Furthermore, the Supreme Court has taken a narrow view on what constitutes "clearly established law." In *Carey v. Musladin*, the Supreme Court reversed a grant of habeas corpus relief because the issue in question—whether the defendant's right to a fair trial was violated when the victim's family sat in the courtroom wearing buttons with the victim's photograph—had never been addressed by the Supreme Court. Similarly, in *Wright v. Van Patten*, the Supreme Court reversed a grant of habeas corpus relieve because there was no Supreme Court precedent establishing that counsel's appearance by telephone amounted to a complete denial of defendant's right to counsel.[35]

The Court has also consistently drawn a distinction between State court decisions applying a broad constitutional standard and ones that apply a narrow rule. As explained in *Yarborough*, where a standard is at issue, State court decisions are given greater leeway:

---

[33] *Bell v. Cone*, 535 U.S. at 694, quoting *Williams*, 529 U.S. at 411; see also *Bell*, 535 U.S. at 698-99 (the prisoner "must do more than show that he would have satisfied *Strickland's* test if his claim were being analyzed in the first instance, because under §2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly."); accord *Holland v. Jackson*, 542 U.S. 649, 653 (2004); *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003); *Price v. Vincent*, 538 U.S. 634, 639-40 (2003); *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

[34] *Brown v. Payton*, 544 U.S. 133, 141 (2005). See also *Mitchell v. Esparza*, 540 U.S. 12, 16-18 (2004) (not unreasonable for state court to find harmless the failure to charge an element of the crime in the indictment); *Early v. P*acker, 537 U.S. 3, 8 (2002) (state court decision may be reasonable even if state court did not know Supreme Court governing law); *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (benefit of doubt must be given to reasonableness of state court decision).

[35] *Carey v. Musladin*, 549 U.S. 70, 76 (2006); *Wright v. Van Patten*, 128 S.Ct. 743, 747 (2008).

> [i]f a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations.[36]

In *Knowles v. Mirzayance*,[37] the Court held that ineffective-assistance-of-counsel claims must be given extra latitude in light of the general nature of the rule: "because the *Strickland* standard is a general standard, a State court has even more latitude to reasonably determine that a defendant has not satisfied that standard."

[36] *Yarborough v Alvarado*, 541 U.S. at 664.
[37] *Knowles v. Mirzayance,* 556 U. S. ____ (2009).

## Argument

As noted above, Habeas Claims Three and Four are procedurally defaulted and therefore not subject to review on the merits. Petitioner's remaining claims, which are preserved, should be denied for the following reasons.

**I. Habeas relief is barred where a State court's rejection of a petitioner's claim is not objectively unreasonable. Here, the State court reasonably found that the evidence presented at Petitioner's trial, viewed most favorably to the prosecution, allowed a reasonably fact-finder to determine that Petitioner was guilty beyond a reasonable doubt. Petitioner's insufficiency of the evidence claim must therefore be denied.**

Petitioner claims that insufficient evidence was presented at trial to allow the jury to determine beyond a reasonable doubt his identity as one of the perpetrators of the murder. The Michigan Court of Appeals considered and rejected this claim on the merits during his appeal of right. Because the State court adjudication did not involve an objectively unreasonable application of clearly established Supreme Court law, habeas relief is barred by §2254(d).

With respect to Petitioner's claim, clearly established Supreme Court law holds that the due process clause protects a criminal defendant from being convicted of a crime without proof beyond a reasonable doubt of every element of an offense. In re Winship, 397 U.S. 358, 364 (1970). The standard of review is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v Virginia, 443 U.S. 307, 319 (1979). The reviewing court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the finder of fact. Marshall v. Lonberger, 459 U.S. 422, 434 (1983). The reviewing court "faced with a record of historical facts that supports conflicting inferences must presume -- even if it does not affirmatively appear on the record -- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution. Wright v. West, 505 U.S. 277, 296-97 (1992). This standard of review does not permit a federal habeas court to make its own subjective determination of guilt or

innocence; the standard gives full play to the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from the basic facts to the ultimate facts. Herrera v. Collins, 506 U.S. 390, 401-402 (1993).

Here, the state appellate court did not unreasonably apply this standard to the facts of this case. Under Michigan law, the elements of first-degree felony murder are (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm is the probable result, (3) while committing, attempting to commit, or assisting in the commission of any of the offenses enumerated in the first-degree murder statute. People v. Carines, 460 Mich. 750, 759 (1999).

In Michigan, every person who "procures, counsels, aides, or abets" in the commission of an offense shall be punished as if he had directly committed the offense. MCL 767.39. "The phrase 'aids or abets' is used to describe any type of assistance given to the perpetrator of a crime by words or deeds that are intended to encourage, support, or incite the commission of that crime." People v Moore, 470 Mich 56, 63 (2004). In People v Riley, 468 Mich 135, 140-141 (2003), the Michigan Supreme Court explained that the prosecution must prove the following to show that an aider and abettor acted with malice:

> [T]he prosecution must show that the aider and abettor either intended to kill, intended to cause great bodily harm, or wantonly and willfully disregarded the likelihood that the nature tendency of his behavior was to cause death or great bodily harm. Further, if an aider and abettor participates in a crime with knowledge of the principal's intent to kill or to cause great bodily harm, the aider and abettor is acting with "wanton and willful disregard" sufficient to support a finding of malice.

The trier of fact may infer the requisite intent from all the facts and circumstances. Among the factors involved in the determination of intent are "the close association between the

Petitioner and the principal, the Petitioner's participation in the planning and execution of the crime, and evidence of flight after the crime." Id., at 569.

Viewing the evidence in this case in a light most favorable to the prosecution, a rational jury could find all the elements of first-degree murder proven beyond a reasonable doubt under an aiding and abetting theory. Larry Evans's testimony suggested that Petitioner had some type of undefined involvement with some of the proceeds of the robbery. Then there is the admission of co-defendant Harper that he was going to "hit a lick." And there was evidence that Petitioner associated with Harper before, during, and after the crime. Their association involved efforts to hide the murder weapons immediately after the crimes were committed, to then retrieving them, and finally moving them to an altogether new location for long term storage. Finally, there is the evidence that Petitioner fled from the vehicle in which he was seated as the police were attempting to make initial arrests soon after the crime was committed. The most reasonable inference from all of this evidence is that Petitioner actively participated in this armed robbery during which two citizens were murdered. Sufficient evidence existed to support his felony murder conviction. The State court did not unreasonably decide this issue.

**II. Where the prosecutor uses good faith efforts to secure the live attendance of a witness, but fails, the witness is "unavailable" for Confrontation Clause purposes. Here, the Court of Appeals reasonably determined that witness Evans was unavailable such that his preliminary examination testimony could be admitted at trial in light of the prosecution's diligent efforts to produce him at trial. Habeas relief is therefore barred by §2254(d).**

Petitioner claims that his right to confront Evans was violated by admission of his preliminary examination testimony because he was not unavailable to testify at trial. The Court of Appeals reasonable rejected this claim on the merits.

The Confrontation Clause of the Sixth Amendment "guarantees to a criminal defendant the right 'to be confronted with the witnesses against him. '" *Danner v. Motley*, 448 F.3d 372, 377 (6th Cir. 2006), quoting U.S. Const. Amend VI. "Where testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 68 (2004). "Testimonial evidence" includes "prior testimony at a preliminary hearing, before a grand jury, or at a former trial." *Id*.

The test to determine whether a witness is "unavailable" for Confrontation Clause purposes is a fact-driven inquiry into the reasonableness of the prosecutor's attempt to produce the live testimony of the witness:

> The basic litmus of Sixth Amendment unavailability is established: "[A] witness is not 'unavailable' for purposes of . . . the exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial. " *Barber v. Page*, 390 U.S., at 724-725 (emphasis added). Accord, *Mancusi v. Stubbs*, *supra*; *California v. Green*, 399 U.S., at 161-162, 165, 167, n. 16; *Berger v. California*, 393 U.S. 314 (1969).
>
> Although it might be said that the Court's prior cases provide no further refinement of this statement of the rule, certain general propositions safely emerge. The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness' intervening death), "good faith" demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith may demand their effectuation. "The lengths to which the

> prosecution must go to produce a witness . . . is a question of reasonableness." *California v. Green*, 399 U.S., at 189, n. 22 (concurring opinion, citing *Barber v. Page*, *supra*). The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness. As with other evidentiary proponents, the prosecution bears the burden of establishing this predicate.
>
> *Ohio v. Roberts*, 448 U.S. 56, 74-75 (1980).

Here, the Michigan Court of Appeals did not unreasonably determine that Evans was unavailable for trial. A hearing was held outside of the jury's presence at which time the officer in charge of the case, Anthony Jackson, testified. 06/13/02, 8-15. Jackson testified that witness Larry Evanshad recently been evicted from his last known address. Jackson checked with the former neighbors of Evans, his known familial contacts, the morgue, the local hospitals on a continuing basis, the county jails, the Family Independence Agency, the Post Office, the Secretary of State, and the 24 hour arrest sheet kept by the Detroit Police Department; all without success. Id. It was not objectively unreasonable for the Court of Appeals to characterize this as a good faith effort to locate the witness for trial. Relief is barred by §2254(d).

**Certificate of Appealability**

A district court, in its discretion, may decide whether to issue a certificate of appealability ("COA") at the time the court rules on a petition for a writ of habeas corpus, or it may wait until a notice of appeal is filed to make such a determination.[38] In the present case, the Court should exercise its discretion to deny a certificate of appealablity.

28 U.S.C. § 2253(c)(1)(A) and F.R.A.P. 22(b) state that an appeal from the district court's denial of a writ of habeas corpus may not be taken unless a COA is issued either by a circuit court or district court judge. If an appeal is taken by an applicant for a writ of habeas corpus, the district court judge shall either issue a COA or state the reasons why a COA shall not issue.[39] A district court is to set forth in its order all of the issues that the petitioner raised in the habeas action and identify those issues, if any, that the district court is certifying for appeal.[40]

In order to obtain a COA, a prisoner must make a substantial showing of the denial of a constitutional right.[41] To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further.[42]

When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong.[43] Likewise, when a district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional

[38] *Castro v. United States*, 310 F.3d 900, 903 (6th Cir. 2002).
[39] F.R.A.P. 22(b).
[40] *In Re Certificates of Appealabilit*y, 106 F. 3d 1306, 1307 (6th Cir. 1997).
[41] 28 U.S.C. § 2253(c)(2).
[42] *Slack v. McDaniel*, 529 U.S. 473, 483-484 (2000).
[43] *Id*.

claims, a COA should issue, and an appeal of the district court's order may be taken, if the petitioner shows that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.[44]

When a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petition should be allowed to proceed further. In such a circumstance, no appeal would be warranted.[45]

"The issuance of a COA must not be pro forma or a matter of course" and a habeas petitioner who seeks the issuance of a COA must show more than the absence of frivolity or the presence of good faith on his or her part in order to obtain a COA.[46] Finally, a habeas petitioner's conclusory assertion that jurists of reason would find his or her claims to be debatable is insufficient to warrant the issuance of a COA.[47]

In this case a COA should be denied because Petitioner has not met this standard.

---

[44] *Id*. at 484.
[45] *Id*.
[46] *Id*. at 337-38.
[47] See *Bagby v.* Saffle, 53 Fed. Appx. 25, 28 (10th Cir. 2002).

## Conclusion

For the reasons stated above, the petition should be denied. The Court should also deny Petitioner any requested discovery, evidentiary hearings, bond, oral argument, any other relief he seeks in this action, and a certificate of appealability.

## Certificate of Service

I hereby certify that on July 28, 2009, I electronically filed the foregoing with the Court using the ECF system, which will send notification to the following:

HONORABLE LAWRENCE P. ZATKOFF
HONORABLE VIRGINIA M. MORGAN

and I hereby certify that Meagan R. Touhey has mailed by United States Postal Service the papers to the following non-ECF participant:

CAMERON WILLIAMS #367772
CHIPPEWA CORRECTIONAL FACILITY
4269 W. M-80
KINCHELOE, MI 49784

Respectfully submitted,

Michael A. Cox
Attorney General

s/ Brad H. Beaver (P48649)

Assistant Attorney General
Attorney for Respondent
Appellate Division
P.O. Box 30217
Lansing, MI 48909
(517) 373-4875